UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 23-CV-20864 SCOLA/GOODMAN

MARIA VELEZ ZAMORA,

        Plaintiff,

v.

KILOLO KIJAKAZI,
ACTING COMM'R OF SOC. SEC.,

        Defendant.

_____/

## OMNIBUS REPORT AND RECOMMENDATIONS ON SUMMARY JUDGMENT MOTIONS

This case challenges a denial of social security benefits. Plaintiff Maria Velez Zamora ("Plaintiff") and Defendant Kilolo Kijakazi, Acting Commissioner of the Social Security Administration[1] ("Commissioner" or "Defendant"), filed cross-motions for summary judgment. [ECF Nos. 14; 21]. The Commissioner's summary judgment motion also served as her opposition response [ECF No. 22] to Plaintiff's motion. Plaintiff filed a reply. [ECF No. 23].

---

[1] ("SSA").

According to the Clerk's directive in these types of administrative appeals, all dispositive matters have been referred to the Undersigned for a Report and Recommendations. [ECF No. 2].

As explained below, the Undersigned **respectfully recommends** that the District Court **grant** Plaintiff's summary judgment motion [ECF No. 14] and **deny** the Commissioner's summary judgment motion [ECF No. 21], **with a remand**.

I.  **Procedural Background**

On December 4, 2020, Plaintiff applied for disability insurance benefits and supplemental security income, alleging an amended onset date of March 25, 2020. (R. 282–88).[2] She originally applied for disability insurance benefits on December 11, 2018 with an alleged onset date of October 29, 2018 but her application was denied at all levels of review.[3] Because her initial application was denied, *res judicata* applied to any period before March 24, 2020, the date of the final previous Administrative Law Judge ("ALJ") decision. (R. 44, 126–42).

Plaintiff alleged disability because of major depressive disorder, idiopathic hypersomnia, and hyper insomnia. (R. 312, 339). The Commissioner denied her

---

[2]  Citations to ("R. __") refer to pages of the administrative record transcript. [ECF No. 11].

[3]  *See Maria Velez Zamora v. Kilolo Kijakazi*, No. 20-cv-23052-Altonaga/Goodman (S.D. Fla.) ("Original Request").

applications initially and on reconsideration. (R. 174–79, 187–91). Plaintiff then appealed the Commissioner's decision. The Appeals Council denied her appeal.

On July 28, 2022, ALJ Rebecca Wolfe ("the ALJ") held a telephonic hearing where she heard testimony from Plaintiff (who was represented by counsel, with the assistance of a Spanish interpreter) and from a Vocational Expert ("VE"). (R. 39–67). On August 26, 2022, the ALJ issued her decision, concluding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 16–38, 39–67). Plaintiff appealed the ALJ's decision, and on January 3, 2023 the Appeals Council affirmed the ALJ's decision. (R. 1–15).

## II.    Factual Background

Plaintiff was 59 to 62 years old when she applied for Disability Insurance Benefits. (R. 32, 282). She has a high school education and previously worked as a kitchen helper and a cleaner/housekeeper. (R. 30, 60, 313).

Plaintiff filed her motion for summary judgment. [ECF No. 14]. In it, she argues that: (1) the ALJ's residual functional capacity ("RFC") assessment conflicted with a finding that Plaintiff's sleep disorder is a severe medically determinable impairment ("MDI"); (2) the ALJ applied an incorrect standard of proof in evaluating what constitutes evidence of severity, persistence, and functionally limiting effects of Plaintiff's sleep disorder; and (3) the ALJ's rejection of Plaintiff's treating psychiatrist's opinion is not supported by substantial evidence. Defendant's motion argues that the ALJ's decision

3

should be affirmed because it is supported by substantial evidence and because the ALJ used the correct legal standards. [ECF No. 21].

### III.  Applicable Legal Standards

In evaluating a claim for disability benefits, an ALJ must follow the five steps outlined in 20 C.F.R. §§ 416.920(a) and 404.1520, which the Undersigned summarizes as follows:

1. **Step one**. Is the claimant performing substantial gainful activity? If not, then an ALJ next determines:

2. **Step two**. Does the claimant have one or more severe impairments? If the claimant does, then an ALJ next considers:

3. **Step three**. Does the claimant have a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled; if not, then an ALJ must determine claimant's [RFC]; and then determine:

4. **Step four**. Based on the RFC, can claimant perform his or her past relevant work? If so, then the claimant is not disabled. If the claimant cannot perform his or her past relevant work, then an ALJ must finally determine:

5. **Step five**. Based on the claimant's age, education, and work experience, and the RFC, can he or she perform other work? If so, then the claimant is not disabled. If not, then the claimant is disabled and entitled to benefits.

*See, e.g.*, *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004).

The claimant bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). In reviewing the decision, the Court must consider the record as a whole and determine whether the ALJ applied the correct legal standard and whether substantial evidence in

4

the record supports his findings of fact. *Powers v. Heckler*, 738 F.2d 1151, 1152 (11th Cir. 1984). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Phillips*, 357 F.3d at 1240 n.8 (internal citation omitted).

The Court is authorized to enter a judgment affirming, modifying, or reversing the decision of an ALJ, with or without remand. 42 U.S.C. § 405(g); *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1302 n.13 (11th Cir. 2000).

**IV.     The ALJ's Findings**

In denying Plaintiff's claim for benefits, the ALJ followed the sequential five-step evaluation process for social security claims. (R. 16–32). At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since March 25, 2020, the amended alleged disability onset date. (R. 25).

At step two, the ALJ concluded that Plaintiff's depressive disorder and sleep disorder qualify as severe impairments. *Id*. The ALJ stated that those impairments "significantly limit the ability to perform basic work activities." *Id*.

At step three, the ALJ concluded that Plaintiff did not have an "impairment or combination of impairments that met or medically equaled the severity" of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). *Id*.

At step four, after a review of the entire record, the ALJ concluded that Plaintiff

had the RFC to perform a full range of work at all exertional levels with some limitations. (R. 26). The limitations are: (1) she can never be exposed to unprotected height or hazardous machinery or mechanical parts; (2) she can understand and carry out simple one and two-step oral, written, and diagrammed instructions but not at a production rate or pace; (3) she is able to tolerate infrequent changes that are gradually introduced in a routine work setting; (4) she is able to interact occasionally with coworkers, supervisors, and the public; (5) she performs best when work deals primarily with objects rather than people; (6) she can maintain concentration for at least two hours at a time; and (7) she can stay on task 90 percent of the workday. *Id*. In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." *Id*. The ALJ additionally "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 C.F.R. § 404.1520c." *Id*.

Finally, at step five, the ALJ found that Plaintiff could perform past relevant work under 20 C.F.R. § 404.1565 as a kitchen helper and housekeeping cleaner. (R. 30). The ALJ explicitly stated that the work involved in those professions "does not require the performance of work-related activities precluded" by Plaintiff's RFC. *Id*.

Accordingly, the ALJ held that Plaintiff had not been under a disability from March 25, 2020 through the date of her decision, August 26, 2022. (R. 32).

## V. <u>Analysis</u>

Plaintiff's Motion argues that Defendant's decision should be reversed and remanded because: (1) the ALJ's RFC assessment conflicted with her finding that Plaintiff's sleep disorder is a severe MDI; (2) the ALJ applied an incorrect standard of proof in evaluating what constitutes evidence of severity, persistence, and functionally limiting effects of Plaintiff's sleep disorder; and (3) the ALJ's rejection of Plaintiff's treating psychiatrist's opinion is not supported by substantial evidence. [ECF No. 14, p. 3]. Defendant's Motion argues that the ALJ's decision should be affirmed because the ALJ applied the correct legal standard and because substantial evidence supports her decision. [ECF No. 21].

The ALJ's RFC includes restrictions and limitations that account for her depressive disorder. [ECF No. 14, p. 16]. Plaintiff argues that even though the RFC included restrictions as to her depressive disorder, it should have *also* incorporated restrictions as to her sleep disorder because that was the "thrust" of her case. *Id*.

Plaintiff highlights the fact that "as testified by the VE, absenteeism of more than two days consistently per month would be work preclusive." *Id*. During the hearing, the ALJ asked the VE about two hypotheticals. In asking her second hypothetical, the ALJ included issues related to sleep disorders:

> Q  [ ] So for hypothetical two, I'd like to build on hypothetical one. For hypothetical two, this individual due to symptoms could be absent two or more days in a typical month. Moreover, this individual due to symptoms that they're suffering may come late or leave early from the job. And I

would say that that could happen two or three times a week. Given those additional limitations, would those jobs, either the past work or the other jobs you've provided in response to hypothetical one, remain viable?

A       While human resource policies do vary regarding time and attendance, the general threshold is exceeding two absences on a monthly basis continuously and repetitively is general[ly] deemed excessive. There may be corrective action allowances, essentially during the initial employment period. If it remains unimproved, either termination or an inability to obtain employment with a history of excessive absences. And generally, tardinesses (PHONETIC) or leaving early is treated the same cumulatively as absences. So, again, exceeding that threshold becomes problematic with maintaining full-time competitive employment.

Q       And in your opinion, how much off-task behavior do most employers typically allow for?

A       There's a general threshold that combines regularly scheduled breaks, morning and afternoon, and lunch and/or dinner. Typically an allowance five-minute hourly restroom, stretch break, . . .. Cumulatively, that's 10 percent of an eight-hour workday. So, again, exceeding that threshold becomes problematic with meeting the time and attendance, pace and persistence standards necessary to complete an eight-hour workday.

(R. 62–63).

After the ALJ questioned the VE, Plaintiff's attorney asked the VE whether it would be work preclusive for Plaintiff to consistently miss a week of work every month. (R. 64–65). The VE responded, "Certainly at that level. In general[,] that would preclude any competitive employment." (R. 65).

Defendant argues that the overall record does not support Plaintiff's argument that her sleep disorder-related absences and tardiness would preclude all work. [ECF No. 21, p. 7]. Defendant states that under 20 C.F.R. § 1545(c), Plaintiff was obligated (yet failed)

8

to produce evidence to support the sleep disorder-related limitations. *Id*. Section 1545(c) states:

> Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 404.1512(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 404.1512(d) through (e).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.

20 C.F.R. § 404.1545(c).

In reviewing the reasoning behind her RFC finding, the ALJ discussed the medical evidence of record and took Plaintiff's sleep disorder in consideration. (R. 27). The ALJ's RFC reasoning included testimony summarized by Plaintiff's counsel, such as Plaintiff's "sleep disorder is highly disruptive to her ability to maintain employment as it would result in recurrent absences." *Id*.[4] The ALJ followed her summary of the testimony with a

---

4   The ALJ also included the following:

> The claimant testified that she has sleep problems. She testified that sometimes she sleeps too much and sometimes can go [five] days without being able to sleep. The claimant testified that she sleeps too much, she sleeps 48 to 72 hours. The claimant testified that she would miss 1 week of work per month due to her sleep problems.

9

discussion on Plaintiff's medical records. Below is the ALJ's discussion related to Plaintiff's sleep disorder:

> On July 15, 2022, Dr. Brignoni completed a form in which she indicated that the claimant's sleep disturbance had resulted in the claimant missing or having had to reschedule her appointments multiple times (Ex. B15F, pg. 2).
>
> From July 22, 2022 to July 23, 2022, the claimant was hospitalized after she presented via rescue because she felt an episode of cataplexy[5] was

---

*Id*.

[5]   According to the National Institute of Neurological Disorders and Stroke, cataplexy is a narcolepsy symptom. It is defined as:

> [The] sudden loss of muscle tone while a person is awake[,] lead[ing] to weakness and a loss of voluntary muscle control. It is often triggered by sudden, strong emotions such as laughter, fear, anger, stress, or excitement. The symptoms of cataplexy may appear weeks or even years after the onset of EDS. Some people may only have one or two attacks in a lifetime, while others may experience many attacks a day. In about [ten] percent of cases of narcolepsy, cataplexy is the first symptom to appear and can be misdiagnosed as a seizure disorder. Attacks may be mild and involve only a momentary sense of minor weakness in a limited number of muscles, such as a slight drooping of the eyelids. The most severe attacks result in a total body collapse during which individuals are unable to move, speak, or keep their eyes open. But even during the most severe episodes, people remain fully conscious, a characteristic that distinguishes cataplexy from fainting or seizure disorders. The loss of muscle tone during cataplexy resembles paralysis of muscle activity that naturally occurs during REM sleep. Episodes last a few minutes at most and resolve almost instantly on their own. While scary, the episodes are not dangerous as long as the individual finds a safe place in which to collapse.

Nat'l Inst. Neurological Disorders Stroke, *What is Narcolepsy?* https://www.ninds.nih.gov/healthinformation/disorders/narcolepsy#:~:text=Cata

imminent (Ex. B18F, pg. 12). She was discharged with an assessment of history of catalepsy (Ex. B18F, pg. 13).

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent with the absence of evidence to support her allegations. **Specifically, there is little, if any, evidence of treatment, aside from a hospital visit, for the claimant's sleep disorder. There is no evidence to support her allegations of sleeping for 48 to 72 hours and not sleeping for [five] days.**

(R. 28–29 (emphasis added)).

Plaintiff relies on *Raduc v. Comm'r of Soc. Sec.*, 380 F. App'x 896, 898–99 (11th Cir. 2010) to argue that an ALJ errs when she fails to incorporate an impairment previously found to be severe in the RFC finding. In *Raduc*, the Eleventh Circuit determined that an ALJ erred by finding the plaintiff's medical issue to be a severe impairment but failing to include limitations caused by it in the RFC assessment and ignoring relevant treating records. *Id.* at 898–99. However, "that case does not stand for the conclusion that an ALJ must include limitations in an RFC based on any particular severe impairment[.]" *Jones v. Kijakazi*, No. 2:21-CV-555-JTA, 2023 WL 2588170, at *7 n.8 (M.D. Ala. Mar. 21, 2023). Additionally, unlike here, the ALJ in *Raduc* ignored medical record evidence, including

---

plexy%E2%80%94This%20sudden%20loss%20of,anger%2C%20stress%2C%20or%20excitement. (last visited January 4, 2024).

testimony and opinions from a treating physician. *Id*.

Plaintiff contends that the ALJ ignored evidence, like the ALJ in *Raduc*, and applied the incorrect legal standard because "in the ALJ's view, the only acceptable evidence of a sleep disorder was a hospital visit." [ECF No. 14, pp. 17–18]. Plaintiff then goes on to summarize notes from Plaintiff's treating psychiatrist, Dr. Evelyn Lopez Brignoni. The Eleventh Circuit has held that for claims filed on or after March 27, 2017 an ALJ must not,

> defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the new regulation provides several factors for determining what weight to give a claimant's proffered medical opinions. Those factors include the supportability of the medical opinion, its consistency with other record evidence, the physician's relationship with the claimant, the physician's specialty, and other relevant information, such as the physician's familiarity with the other record evidence and with making a claim for disability. *Id*. § 404.1520c(c)(1)–(5).

*Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 897 (11th Cir. 2022).

Here, because of her earlier appeal, Plaintiff's alleged onset date is March 25, 2020. (R. 282–88). Some of the treatment notes Plaintiff includes in her medical-notes summary are of dates *before* March 25, 2020. In discussing Dr. Brignoni's opinions, the ALJ explicitly did not find Dr. Brignoni's opinions to be persuasive when: (1) they were given *prior* to the period at issue and (2) did not address Plaintiff's functioning during the period at issue. (R. 29–30). With regards to Dr. Brignoni's June 2021 opinion, included in Plaintiff's summary, the ALJ found it

> not persuasive as it is inconsistent with the treatment records documenting

>  the claimant's dysphoric and anxious moods but fair to good judgment, mostly cooperative attitude, and mostly unremarkable thought form and thought content (Ex. B10F, B13F, B14F, B16F, and B17F). While those treatment notes document impaired memory at times and some decreased attention and concentration, they do not contain evidence to support that those limitations would result in marked or extreme functional limitations. To the contrary, formal memory testing showed that the claimant had scored in the average range for auditory memory and borderline range for visual memory skills, which the consultative psychologist assessed to be only mildly impaired (Ex. B7F, pg. 6).

(R. 29).

Finally, the records Plaintiff includes within the relevant time period are not helpful. (R. 750; 751; 752; 766; 772; 773). They merely state "Sleep: +/-" with no explanation as to what that "+/-" symbol means, especially when *both* are circled. Therefore, none of what Plaintiff highlighted in her summary as "ignored" evidence is applicable, relevant, or persuasive.

Plaintiff then implies that when the ALJ said that "there is little, if any, evidence of treatment, aside from a hospital visit," she was imposing a "condition *sine qua non* for crediting the functionally limiting effects" of her sleep disorder. [ECF No. 14, p. 20]. Plaintiff relies on *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir.1988) for support.

In *Dawkins*, the Eleventh Circuit held that "refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability," and "poverty excuses noncompliance." *Dawkins*, 848 F.2d at 1213. "Additionally, when an ALJ relies on noncompliance as the sole ground for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with

13

prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). The *Dawkins* Court reversed and remanded the case because the ALJ's finding was "inextricably tied to the finding of noncompliance," and, in making that finding, the ALJ never considered the plaintiff's ability to afford the prescribed medical treatment. 848 F. 2d. at 1214.

Here, the ALJ stated, "[s]pecifically, there is little, if any, evidence of treatment, aside from a hospital visit, for the claimant's sleep disorder. There is no evidence to support her allegations of sleeping for 48 to 72 hours and not sleeping for [five] days." (R. 28–29).

Defendant argues that, under *Ellison*, an ALJ is "only required to consider excuses for failure to seek treatment when a lack of treatment is the primary basis for an adverse decision." [ECF No. 21, p. 11 (citing *Ellison*, 355 F.3d at 1275)]. Defendant also argues, citing *Thompson v. Comm'r of Soc. Sec.*, No. 8:19-CV-124-T-60JSS, 2020 WL 1067162, at *7 (M.D. Fla. Jan. 15, 2020), *report and recommendation adopted*, No. 8:19-CV-124-T-60JSS, 2020 WL 1065181 (M.D. Fla. Mar. 5, 2020), that Plaintiff failed to show that "her sleep disorder caused additional limitations beyond those in the ALJ's RFC finding." *Id*.

Defendant's arguments miss the mark because they fail to recognize the problematic weight of Plaintiff's sleep disorder considering the VE's testimony and how it is tethered to her access to financial means.

14

If Plaintiff's sleep disorder is as severe as she testified to, and would cause her to consistently miss more than two days of work, then how is she supposed to hold *any* job? The VE explicitly said that consistently missing more than two days of work, and certainly a week of work every month, would likely be work **preclusive**. (R. 64–65). But, the ALJ's RFC did not include any limitations related to Plaintiff's sleep disorder because there was "no evidence." As Plaintiff states, the very nature of her impairment "eludes direct physician observation absent the unlikely event that she would fall asleep during a doctor's visit." [ECF No. 14, p. 20].

In her responses to the Mental RFC Interrogatory form dated July 15, 2022 (within the period at issue), Dr. Brignoni said that "a sleep center might help improve [Plaintiff's] functioning and quality of life, but she is likely to deal with this for the long haul." (R. 769). She additionally said that because Plaintiff "has **NO** means to pay for the treatment/evaluation," none has been attempted. *Id* (emphasis in original).

During the hearing, Plaintiff told the ALJ that Dr. Brignoni goes out of her way to help eliminate or reduce costs for Plaintiff so that she can continue seeing her. (R. 54). So, when the ALJ states that there is "no evidence" to support Plaintiff's sleep disorder, it raises the following question: how is she supposed to gather evidence if A) her disorder is something that can be observed *only* under special circumstances (like a sleep study); and B) she's *substantially* financially limited -- to the point where her longtime psychiatrist goes out of her way to help alleviate the financial burden? Plaintiff's financial

15

status restricts her access to options, and the ALJ should have discussed that in her RFC finding because of the potential consequences of her sleep disorder on **any** job.

Aggravating this omission in the analysis is the fact that the ALJ found that Plaintiff's sleep disorder qualified as a **severe** MDI that "significantly limit[ed] the ability to perform basic work activities[.]" (R. 25). The ALJ specifically reviewed 20 C.F.R. § Pt. 404, Subpt. P, App. 1 Section 12.00 for mental disorders.

Section 12.00 arranges the listings for mental disorders in eleven categories. The ALJ specifically focused on Section 12.04, labeled "Depressive, bipolar and related disorders."(R. 25). In it, it states that to qualify as severe, the "mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." The ALJ found that Plaintiff's sleep disorder MDI, while severe, did not meet or medically equal the severity of one of those listed codified impairments under paragraph B or C criteria. (R. 26). In considering whether the paragraph C criteria was satisfied, she said that the "record is devoid of evidence of the requisite marginal adjustment." *Id*.

But, with no money and with a unique disorder that can be observed only under a particular set of circumstances (like a sleep study), Plaintiff's ability to present that kind of evidence is hampered. A court within this Circuit reasoned that:

> [I]t is well established that an ALJ must consider evidence showing that claimant is unable to afford medical care before discounting his credibility based upon failure to pursue or comply with treatment. *See, e.g., Beegle v. Soc. Sec. Admin., Comm'r*, 482 Fed. Appx. 483, 487 (11th Cir. July 23, 2012) (*per curiam*) ("[T]he ALJ may not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue

16

> medical treatment without first considering any explanations that might explain the failure to seek or pursue treatment"); *Dawkins*, 848 F.2d 1211, 1213 (11th Cir. 1988) (same); *see also Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) (stating that an "ALJ must consider a claimant's allegation that he has not sought treatment or used medications because of lack of finances").

*Alvin T. v. Kijakazi*, No. 1:20-CV-00988-AJB, 2021 WL 9711025, at *15 (N.D. Ga. Sept. 27, 2021).

Here, the ALJ did discount Plaintiff's credibility based upon a failure to pursue or comply with treatment, finding that her "statements about the intensity, persistence, and limiting effects of [ ] her symptoms are inconsistent with the absence of evidence to support her allegations." (R. 28). She discounted Plaintiff's credibility because there was no other evidence (beyond her testimony) available that supported her allegations. But the issue is more than just the lack of evidence available; it is the reasoning (or lack of reasoning) behind **why** there is a lack of evidence. The Court finds that, had the ALJ properly considered the cause for Plaintiff's lack of evidence, she may have adopted a different view of the severity of Plaintiff's sleep disorder, which may have altered the ALJ's view of Plaintiff's disability or her RFC. *Id*. (citing *Beegle*, 482 F. App'x at 487).

Consequently, the ALJ's error merits remand. Therefore, because the case should be remanded, the Undersigned will not address the remaining purported errors included in the ALJ's decision. *Brown v. Comm'r of Soc. Sec.*, No. 6:20-CV-840-GJK, 2021 WL 2917562, at *4 (M.D. Fla. July 12, 2021). "The ALJ will have to reweigh the evidence upon remand and may reconsider the issues raised by [the] [c]laimant." *Id.* (citing *Diorio v. Heckler*, 721

F.2d 726, 729 (11th Cir. 1983) (on remand, the ALJ must reassess the entire record); *McClurkin v. Soc. Sec. Admin.*, 625 F. App'x 960, 963 n.3 (11th Cir. 2015) (no need to analyze other issues when case must be reversed due to other dispositive errors).

## VI. Conclusion

How is the Plaintiff expected to maintain any form of employment if her sleep disorder results in multiple consecutive absences? How is the Plaintiff, with limited to no financial means, supposed to seek treatment or develop medical record evidence that supports the existence and severity of her sleep disorder? These are questions the ALJ needs to address and articulate on remand so that the Court can properly evaluate her findings.

Because the ALJ failed to adequately address the impact of Plaintiff's financial status on her access to treatment, the Undersigned finds that the ALJ's decision is not supported by substantial evidence and should be remanded to the Commissioner for further proceedings. Upon remand, the ALJ will be able to assess the other arguments, as well.

Therefore, the Undersigned **respectfully recommends** that the Court **grant** Plaintiff's Motion [ECF No. 14], **deny** Defendant's Motion [ECF No. 21], and **remand** the case.

## VII. Objections

The parties will have fourteen (14) days from the date of being served with a copy

of this Report and Recommendations within which to file written objections, if any, with Senior United States District Judge Robert N. Scola, Jr. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on January 8, 2024.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola, Jr.
All Counsel of Record